Mr. Bias? Your Honor, good morning. May it please the Court, Joseph Bias for the Petitioner, the Mojave Desert Air Quality Management District. Joining me at Council's table today is Rick Rothman, a partner at our law firm Morgan Lewis & Bacchus. I'd like to reserve four minutes for rebuttal, please. Thank you. The District here seeks review of just one part of the final rule, EPA's rejection of the use of voluntary emission reductions as offsets. For over 30 years, the District has given credit to operators who voluntarily reduce their annual actual emissions below the maximum permitted levels. When these good citizen operators seek approval for new projects, the District's rules allow them to use the surplus emission reductions to offset emission increases from the new projects. Now, an example here will help to illustrate how this works. Say we have a plant, and the plant has a boiler, and the boiler's permit allows it to emit up to 100 tons per year, which are fully offset with real reductions of actual emissions. Now, this good citizen operator, however, is able to restrict the use of the boiler to ensure that it never emits more than 70 tons per year. Now, later, the plant grows and it requires a new generator. So the District and the operator agree to revise the permit for the boiler to reduce the allowable emissions by 10 tons per year, so it brings it down from 100 to 90. Now, the District's rules allow the operator to use some of the surplus resulting emission reductions to offset emission increases from the new generator. Now, EPA approved of these offsets in 1996. Twenty-five years later, it rejects them without explanation. This court should vacate that rejection first, because it is contrary. I just want to ask you, in the hypothetical you just gave, what is the amount of the offset? What are you subtracting? What quantity of offset are you talking about when you... So, yes, Your Honor. So the offset would be the 10-ton emission reduction. Now, that would have to be further... From 100 to 90. Right, from 100 to 90, of course, yes. And so, in that case, that's the 10 tons of reduction. There would, of course, be a subject to an additional reduction to... And your point is that should be credited. That should be credited, yes, Your Honor. That is the point here. And it's required by the Clean Air Act, which mandates that these emission reductions shall be creditable as offsets. Moreover, at a minimum, this court should vacate EPA's rejection, because it is arbitrary and capricious. So, you know, you're about to get to that, but so you said 25 years later, obviously EPA... It seems like EPA's argument is, no, no, we made that change in, I think, it's 2002. So why is that not correct? So they're saying, no, no, we made that change way back then. You didn't catch us too late. Fair enough. Yes, Your Honor. So the change that they're referring to was the addition of paragraph A32J to the implementing regulation. Now, that paragraph addresses the calculation of emission increases from a modification. It does not address the question here, which is what emission reductions can be used to offset that emission increase. And the 2002 rule itself expressly states that it wasn't changing that issue. It wasn't addressing what could be used as an offset. So there's no basis there to say that any change through the 2002 rule would explain the reversal here. So your position, one way you could characterize your position is that their rejection of your in this case, that's at issue in this case, is when they are actually sort of reinterpreting that provision in a way that is new. Well, what's interesting, Your Honor, actually, if you look at the final rule, they never did actually interpret it that way. They repeatedly stated that what it did is exactly what it says that it did, which was to effectually codify how you calculate emission increases, which in this case is to use actual emissions as the baseline. They never actually said that this is what you use to determine what is a credible emission reduction. So as it stands today, in fact, actually, when you look at the briefs, they still don't say that. The EPA recognizes that this is on its face and expressly what it states is simply a calculation of the emission increase. I think it might help here to just back up for a quick second and look at the final rule. So what we're dealing with here is, you know, several deficiencies, as I'm sure Your Honors have noticed, but specifically there were three rejected uses of the emission reductions that are at issue here, which is District Rule 1304C2D. The first rejected use is in the calculation of whether or not the permit program applies. There's a specific netting calculation. The second rejected use was in this calculation of emission increases under Paragraph A32J, and the third rejected use was as an offset. Now, the first rejected use had to do with a specific paragraph of the regulation. It's not at issue here. In fact, the District is not even allowed to do netting, so it really doesn't apply because of California law is stricter in that regard. The second one is the netting calculation we've talked about. Now, the District said in its comments it is not challenging either of those two rejections because it never intended for these C2D emission reductions to be used for that purpose. In fact, it asked EPA to help it revise the rules to clarify that that wasn't the intent, and while that didn't happen before the final rule, it did happen here. The rules have been revised to conform with what EPA wanted, and those revised rules are currently before EPA for approval. So what that leaves now is the third rejected use, which is as an offset, and the only basis for that that's provided in the final rule is the conclusory assertion that these offsets may be based on paper reductions. Now, EPA doesn't provide a further explanation of what it means or the basis for this determination, and that's particularly troubling here because in 1996, when it approved the offset rule, it did so on the express determination that the District's rules ensured that these were based on real reductions of actual emissions, and those rules continue to exist today. A prime example would be District Rule 1304C1. That rule mandates that the C2D emission reductions at issue here must be real reductions of actual emissions and meet all the other requirements of Section 7503C of the Clean Air Act, and when they do, emission reductions that meet those standards under subsection C2 shall be credible as offsets. So here what we have, you know, Congress is— In your hypothetical where you're taking it from 100 to 90, is that a actual decrease or is that just a decrease of the allowables? No, Your Honor, so that's an actual decrease, and the way to look at it is the allowable—the elimination of the allowable emission, the emission reduction from—actually, let me back up and start from the beginning. So the emission reduction that was instituted at the original permit proceeding to offset the 100 tons. Now, when we eliminate the fully offset allowable emission, when we reduce by 10, now the emission reduction that was offsetting those 10, well, it's no longer required to offset the allowable emission because the allowable emission is now eliminated. But it depends on it being fully offset previously by actuals. Is that your position? Well, yes, Your Honor, so by District Rule, they have to be— By District Rule. And I'm aware there's no debate here between the parties that that original 100 tons would have been fully offset with real reductions of actual emissions. The rules require it. EPA recognized that in 1996. In fact, it was the basis for the approval in 1996, and we're talking about the same rules here. So to go back to Judge Preston's question, you said—he said, is that actual or is—and you said it was actual, but it's deemed to be actual by the rules. But if you're going from 100 to 90 but you were only emitting 70, and it sounds like you now want to increase the—under your example, you want to increase it, but you know that you'll only be increasing it up to 90. Isn't the EPA's position that no, that's—that's a paper—that that's a paper offset? You're absolutely right, Your Honor. I apologize. I was midway through the answer, and I stopped to answer a second question. So the reason that they are real reductions of actual emissions is we start with these are real reductions. We eliminate the allowable emission that they were offsetting. Those real reductions are permanent. So they continue to exist. Even after we've now eliminated the allowable emission, they're real, permanent, and enforceable. And so those emission reductions, they continue to exist. And when we eliminate the allowable emission, now that emission reduction is no longer offsetting an allowable emission. So the next question is, is it offsetting an actual emission? Well, because of our good citizen operator who's restricted the use to ensure it never goes over 70 tons per year, the answer is no. Because there was no actual emission that went up into that, you know, 100 to 90 range. And so in that case, under subsection C-2 of 42 U.S.C. 7503, that emission reduction is not otherwise required by the Act. And in that scenario, Congress was very clear here, and it mandated that it shall be credible as an offset. So the emission reduction remains as real as it was on the day it was put in place. The only difference is it's no longer required to offset an allowable or an actual emission. Sorry, go ahead. So if I'm understanding correctly, the way the rule has operated in the past, at least your position is, the way the rule has operated in the past, you have permission, you have an allowable permission to do 100, say. But you're saying good citizen is only doing 70. And part of that is just because whatever you get permission for, you always expect it will be somewhat less than that. But now you're operating it, and you're always staying under 70. So there is a benefit of 30 less than emissions. And it seems to me, if we accept your position that this is a change from what the EPA has done previously, how the EPA has interpreted it previously, what they're doing is they're basically saying you don't get any credit for that. You can't use that 30 somewhere else. Based on what your good citizen's operator's decision to emit less, they just lose it. They just lose it. And if they do that, then obviously their incentives are now very different. Instead of having an incentive to do less and be able to use that somewhere else, they will presumably emit up to their – you create a use it or lose it situation. Am I understanding that correctly? You stole the line directly from my mouth. I was about to say use it or lose it. But the key thing is when did this – if there is this change, when did it happen? And it seems to me that the EPA's position is if we – and I understand your statement earlier that, well, they haven't even really been super clear about this. But if they were – if the EPA would say, yes, we made a change – because I think they can't say this was the way we treated it in 1996. So then the question becomes when did they make this change? And I think the EPA's position would be we made that change in 2002. That seems to be their – and I think your position is, no, you're making that change now. Is that – am I – That is precisely the position with the only caveat, I would say, is the 2002 rule that they're relying on expressly stated repeatedly we are only addressing NSR – That's what I was going to ask you. What is your best argument or arguments that this change did not happen in 2002? So the two arguments here that I'll present, best and brightest, number one, the actual express language of A32J, which is the provision that we're talking about that was added in 2002, expressly states it only applies to the calculation of net emission increases, and there's been no dispute about that here. The second is that the 2002 rule, when it promulgated that rule, it was actually just a sidebar to what it was doing, which was addressing NSR applicability. But regardless, repeatedly throughout the rule it said we are not addressing offsets. We're just not doing that here. So there is no way to interpret either – if you approached it from a Keysore perspective, the text, the structure, the history, the purpose, all point to exactly what it is, and that's not even disputed here. That rule is limited only to the calculation of emission increases, and we're still left with the reality that the determination of what emission reductions may be used as offsets is directly governed by the statute. Congress has spoken directly here. It didn't give EPA discretion to make decisions. If an emission reduction meets the requirements of Section 7503C, which is to say it is a real reduction of an actual emission, ineffective and enforceable, not otherwise required by the Act, then under subsection C2 it shall be creditable as an offset. Now, Congress's use of the verb shall there is mandatory, and it leaves EPA with no discretion to disapprove of a qualifying emission reduction as an offset, which in order to interpret the 2002 rule, contrary to its own language, contrary to this legislature, you would have to have it somehow trumping the statute, which it cannot do here, because as I explained earlier in our example, it's not an issue of how EPA views it. The reality is this is an emission reduction that ceases to be required by the Act when you eliminate the surplus fully offset allowable emission. In that case, C2 is clear. So with that, I will turn to the second argument, which is the arbitrary and capricious nature, and I think we've largely covered it, so I'll just quickly state that, you know, there's no dispute here that in 1996 when EPA approved of the offset rule, it did so based on the reductions in actual emissions, and nor is there any dispute that EPA takes the opposite position here. Now, EPA cannot reverse itself without providing good reasons and assessing both the existence and the strength of the reliance interest, and EPA had failed to do either of these things. The only reason it provides is the conclusory assertion that these are based on paper reductions. If you look at the final rule, there's a lot of talk about other things and other uses, but that's all we have here on the issue of offsets is that conclusory assertion, and assuming that there's no further explanation of the meaning or the basis for that determination, that's not good reasons. Finally, EPA admits that it failed to consider the significance. Can I get you to do something helpful with this? When EPA gets up and gives us their argument as to why they're right on, you have two parts, you have the arbitrary and capricious nature, and you have, okay, so when they get up and they give us their argument on, because this is complicated, it's hard to wrap our head around this, when they give us their argument on the first part, then I need you to get back up and tell me what parts of that argument were not included in their rule to you, because it's obviously, they can't make arguments before us that they did not make, that they did not provide as a rationale when they rejected your rule. This goes to your arbitrary and capricious. Correct. But it's very difficult to track, for somebody like me, which part, so I need you to get back up and say this, this, this, so I'm going to hold the EPA's feet to the fire. These rationales that they're giving as to why their rule is allowed by the statutory structure are not responses they gave to us, and so then they're not allowed to make them to us. I need to know where those lines are, and I need you to tell me where those are. So you've got four minutes, you want to reserve four minutes. Yeah, we'll give you some more time, but on a related note, though, I mean, they can't say things now they didn't say before, but you can't raise things now that you didn't raise before, either, in front of the agency, and that is another issue they've raised, is did you actually put them sort of on notice of all of these, because one does have the distinct impression, reading the briefing, that there's a whole lot more ink being spilled on these issues than was spilled before the agency, and there has to be a reason for that. Yes, Your Honor, so when we look at the comments, we first need to start, when we assess them, with the notice of proposed rulemaking, and what did EPA say it was going to do, and it proposed to reject the offset rule, again, as I said, based purely on the conclusory assertion with no further explanation, so the district started with far less information than it would need to move forward, frankly, but nevertheless, its comments clearly articulate the challenges that it's asserting here. Number one, EPA asserted, or I'm sorry, EPA, the district reminded EPA that it had approved of the offset rule in 1996 based on the express determination that it complied with the Clean Air Act. The district then asserted that the Clean Air Act had not changed since 1996, and therefore, if it complied then, it should comply now, and therefore, it should be approved. Third, EPA, the district reminded EPA that its concerns about paper reductions were unfounded, particularly given that the district's rules expressly prohibit paper reductions, rules like 1304C, and finally, the district's comments challenged EPA's failure to explain its reversal of the approval. Now, these are the bases of the challenges that are asserted here today, and they satisfy the obligation to provide EPA with notice of the challenge, which is all is required, as recently clarified in the recent Ohio versus EPA case, and so in that sense, these challenges are properly before the court. The obligation does not extend further to drive into detail on the legal arguments. Okay. Why don't we hear from your opposing counsel, and we'll put five minutes on the clock for  Thank you. Thank you. May it please the court, I'm Andrew Doyle with the Department of Justice's Environment and Natural Resources Division for the EPA Respondents. With me today at counsel table are Monica Gibson and Jacob Finkel with the EPA. The EPA's limited disapproval of the district's rule 1304C2D and the corresponding rules that cross-reference it is valid because it does not meet federal Clean Air Act minimum requirements. The essence of what EPA did here in this case was to apply the plain, clear terms of a federal regulation, I'm going to call it subsection J for short, to the district's rule. Subsection J provides that in areas that do not meet national health-based air quality standards, a state implementation plan shall calculate offsetting emission reductions in a particular way. Now, the district follows subsection J, that actual emissions-based calculation method, for some qualifying sources, but it departs substantially from that required method as to other qualifying sources, specifically certain major modifications to existing major stationary sources that, under a prior permit, were required to obtain offsetting emission reductions. The upshot of the district's rule 1304C2D is that there will be fewer offsetting emission reductions when, as is typically the case, as Your Honors recognized, there's a difference between what the source could emit under its pre-existing permit versus what the source actually emits before the proposed major modification at issue in the second permit decision. Do you agree that the district was allowed to do this for some time and then the EPA decided that it should no longer be allowed? They're allowed to do it today, and that's because this is a limited disapproval action which allows a substantial time for the district to correct its rules. Okay. But let's put that aside. It sounds like there's a grace period where they could come into compliance, but prior to this, there was a determination by the EPA that the district could do what it wants to do, and now we're being told it cannot. Is that fair? That's fair. In fact, Judge Van Dyke noted that in 1996, there was no subsection J. It was approved. Subsection J came along in 2002, and now there is an explicit codified regulation that sets forth Can I ask something? It seems like in some way, you know, this is a super complicated issue for me, at least, with all the variabilities. I'm trying to narrow it down to what the part of your dispute between the parties that I think this case might turn on. So I think your argument is that J, which was enacted and which was promulgated in 2002, changed, was the change. So do I understand correctly? I just want to make sure I understand. Your argument is that in 2002, before that, they were allowed to do what they want to do, but after 2002, they were not. So the change was not more recently when you rejected it, but that the change actually happened in 2002. Am I understanding that correctly? That's fair, Your Honor. In 2002, the basic rules for the NNSR program, the Nonattainment News Source Review program, there was a big change in the Federal Register. Okay. So obviously, you read their briefing. The district says, no, no, J did not change things in 2002, which you're reinterpreting J to be a change that it did not actually enact in 2002. And what is your response to that? I mean, and they point to, I think, a technical document that went along with it and saying that we are not changing anything about offsets. So what is your response to that? Our response to that is J was a codification into the regulations that made the methodology that's required clear. That doesn't help me that much. I mean, in layman's terms, what is your response to the fact that, I assume you, do you think that J made the change in 2002 or did it make the, or is it, or are you interpreting J in a way that makes the change now? Ever since J came along, EPA has had the same interpretation of J and has applied it consistently, which a point we've made in our brief. But before J, you had the AXE requirement and there's, that's at 7503C2, so it's 42 USC 7503C2, and that is, has language about what is required in terms of offsets. The EPA had a position about what that statute meant and generally it was an actual emissions-based calculation as it is now clearly under J, but still there was not a regulation tying the agency's hand in each and every review of state implementation plans. Okay, so now I'm a little more confused because I thought you had conceded, in response to Judge Breslin, my question, that there was a change, that there was a time when they were allowed to do what you're not allowing them to do now. And all I'm trying to figure out is when that, and now it sounds like you're saying, no, we always, even before J, the statute required that. But are you saying that the statute required that but we, we weren't enforcing the statute properly and that's what J did, is it, is it, it made us enforce the statute properly? No, and I'm sorry if I'm being unclear about this. My point is that J was, for the first time, there's a regulation explicitly sets out the formula. Before J, it was the agency generally viewing the statute to require an actual emissions-based calculation, but importantly, there is the provision that existed before J came along and this is 51-165A3I, you can find it in our addendum at page 32, and that provision states that if the state is using, whatever the state is using as its currency for reasonable further progress air quality planning, you've got to follow the same currency for your offset purposes. It's all very complicated. Let me, let me see if we can come at this at a different angle, because what I'm trying to figure out is, trying to figure out when, when, when if there was a change made, that the change was made, and then obviously the next part of it is, did you explain? If there was a change made at some point, did you explain the change? Because, you know, under the law, you have to, you have to explain if you're making a significant change. Yes. And their, their argument, as I understand it, is you didn't make a change until now, and when you, even though you passed J in 2002, you didn't make a change until now, and then when we asked you, why are you making this change, then you said J, and their response is, but J didn't, but, but yeah, you passed J in 2002, but you didn't, but it didn't mean what apparently you think it means now, then, and what I'm trying to figure out, I'm just, I'm trying to get your answer to that, would, so to come at it at a slightly different angle, you would agree that your, your, what are you, what do you think is your answer to their request as to why are you making this change now in the, in the agency process? J was part of it, right? You cited the J. We're following the clear terms of a, of the regulation, and so their, their rule compared to that regulation falls short. Sure. The regulation is J, is that? Correct.  So, you're saying J is the reason, and, and, and that's pretty much all you provided in your response was, was you pointed to J, and so what I'm trying to figure out is. Well, could I, if I could just interrupt you for one second. Yeah, yeah, yeah. There's the secondary point that you will not find another district in this country that follows anything other than a J formula. EPAs consistently apply J in the few aberrations over time that have come up. The struggle I'm having with that, I remember you saying that in your brief, and the struggle I'm having with that is Mojave is saying when you say applies J, is it, is it the, if Mojave's right that there's a different way you're interpreting J now versus before, then which J are the other districts applying? This is part of the struggle that I, that I was kind of alluding to with your counsel on the other side is there's all this discussion, there's all this discussion before us and in the briefs, and, and, but I don't, all I see is just pointing to J as a very terse short answer in response, and I'm trying to figure out if that's a sufficient answer under the APA. That's what I'm trying to figure out. Well, it is a sufficient answer because agencies are allowed to change their, the outcome of a review of a state implementation plan based on change of circumstances, and J is that change of circumstances. It's now a codified methodology. EPA has not changed its interpretation of J. What has changed here is the outcome for the district. The district in 1996 had a very similar rule that was approved, and now, fast forward in time when they had to resubmit a set of rules, EPA has denied that, or has disapproved that rule. J has always maintained, EPA has always maintained its same view about J. Before J came along, as this is what I was talking about earlier, there was a regulation at A3I that said whatever your, whatever emissions, whatever currency you're relying on, you, the state, for your air quality plan, and you've got to use the same currency for your, for your offset. So there may have been more leeway prior to J came along so that if the state is relying on allowables to show that it's making progress towards making the standards, it can then rely on allowables to some extent for their offset emissions. Okay. Well, so now this is starting to get to a key issue, which is what does J actually mean? Because your friends on the other side say, well, you know, J is about calculating the amount of emission increases and not about calculating the creditable emission reductions. And I hear you basically saying, no, those are sort of the same. You have to follow the same methodology for that. So how do you work through this particular dispute between the parties? You're right, Your Honor, in the sense of the currency has to match on both sides of the equation. Okay. So we just, where are you getting that from? Are you getting that from J or are you getting that from some other aspect of the regulations or the scheme? We're getting it from, well, J provides the calculation for the offsetting emission reductions. The A3I provision that I was talking about with Judge Van Dyke talks about you must do the crediting under the same currency that you do your air quality planning. So again, the district is clear at SCR 50 and also the statute requires the actual emissions based inventory at 42 USC 7502 C3. So just to... So the crediting has to be on actuals as well, so both sides of the ledger are matching here. So when the other side says the problem with J is that it doesn't deal with creditable offsets, your answer is, yeah, we understand that except that J is setting a baseline for emission reductions and other parts of the scheme tell us that when you're talking about creditable offsets, you have to be using the same currency. That's true as to what federal law requires. However, it's important to know that in this litigation, it's the first time the district has pitched this as really an issue about credits, not an offset calculation method. In the 2 ER 25, 108, 112, 276, the district is constantly describing its rule 1304 C2D as a calculation method. It's talking about reducing the amount of offsets required to certain triggering major modifications. It's talking about a reduction of the offset burden. That's a direct quote from 276. So this is the first time they're trying to pitch it as a credit, and we think that's because they're trying to avoid the clear terms of J, which really leaves them no room here. No, but you have hit on a dynamic that seems to be at play here, which is I cannot tell from the briefing whether the sides are, both sides are talking past each other in terms of what the district's rule is actually doing. Well, we don't think we are talking past each other. First of all, we have the issue, of course, of forfeiture, which Your Honor has raised. They're not saying enough in their comments to make sure we are on the same page. But putting that aside for the moment, again, the district is pitching this rule to EPA as an alternative calculation method for a specific subset of sources, and in their world, it matters that the source in the original permit action fulfilled its offset obligations. They believe that matters. We say no. J is for each and every proposed modification that comes along, you must capture those increased actual emissions and make sure there's a corresponding offset, so the air doesn't get any worse at a minimum. After all, the goal is to get these areas, for health-based reasons, into attainment, and you won't be able to do that if we're not assessing what's actually being improved in the air if more sources are coming along. At the same time, of course, the Act recognizes there must be growth, so you don't want the offset to be any more than necessary, and that actually gives the sources in the original permit action, in the hypothetical that came up today, that 100 tons per year cap, it gives the sources the encouragement to set that cap very realistically so that they don't have to purchase more offsets than are required. They may not need a 30 ton per year leeway. You want to have some leeway, as Judge Van Dyke noted. You don't want to go right up to your cap for many reasons. You don't want to risk violating the permit, but at the same time, you want to make sure that all of the actual emissions increases that are being put into the air by the project are going to be captured. And so, there's the issue of what does the subsection J require as a matter of law, and we believe that EPA followed federal law correctly here and that the district rule does not. There's the issue of what kind of obligation is due in terms of an explanation when, given that in 1996, the EPA approved a similar rule here, and the law is clear that when the circumstances change, which EPA concisely but reasonably explained that J is a change, it's a change in terms of . . . So, Jay, do you . . . that's about what I was going to ask, is what is your position on whether J was a change from the methodology that the EPA was using before that? It was not a change for many air districts in the way they calculated it. Many air districts followed EPA's general, actual emissions-based reading of the statute, but it's one thing to have a practice, it's another thing to have a requirement in federal law and a regulation, a duly promulgated notice and comment regulation. Agencies must follow the terms of their own regulations. So, maybe I should more specifically ask, do you think it was a change with regard to how the EPA would treat Mojave's circumstances they're talking about? Definitely on that, Your Honor. So, you think J was a change with regard to that. Did you say when you promulgated J whether it was a change or not? We said it was new, and we said it was important to follow a different methodology for when you determine whether the source is triggered in the first place for nonattainment new source review versus how many offsets are required. So, do you think . . . I mean, obviously, Mojave is saying now that this was . . . you understand, Mojave's argument is this was presented as not being a change, as merely codifying the EPA's preexisting practice. That's their position now. And so, they're saying that to the extent that it does represent a change, that that change did not happen in 2002, it's happening now. And so, what . . . your position, I guess, is no, it happened in 2002, and it just slipped by you that it happened in 2002, and it just didn't really have . . . it didn't really come into play for Mojave until now. Is that . . . I'm just trying to understand. I'm trying to . . . I have the same feeling, and it doesn't sound like Judge Breyer. It does feel like the two parties are talking past each other, and I'm trying to figure out what the disagreement is, because that's what we have to decide. So, is that a correct summary, is that . . . because I think I just heard you say that there was a change in . . . that J was a change, at least with regard to . . . maybe not generally, but at least with regard to the issue in this case, and you think J happened in . . . and that change, you think, happened in 2002. But as I understand it, Mojave's saying, we had no notice that that had happened in 2002. In fact, my understanding is that they read your comments as saying, this is not a change, sort of like what you just kind of told us before I pinned you down on Mojave, that it is not a change. And so, I'm trying to figure out whether they have adequate notice. Well, they've had adequate notice. The EPA and the district have had meetings on this going back into 2018. They've had letters even before the rulemaking began here, beginning in 2019. Those letters are in the excerpts of record. The court can read the back and forth, leading up even to the rule where the EPA is formally offering an opportunity for notice and comment, not only to the district, but to any affected sources, any interested person. No one is commenting other than the district. Back to 2002, many parties challenged the suite of regulatory reforms that year, including other air districts from California. I don't believe Mojave did. They were arguing that, hey, EPA, you're taking away some discretion from the states to allow, to rely more on allowables rather than actual emissions. And the D.C. Circuit, on review of that, actually said, we agree that actuals is important. The EPA is not taking away the state's discretion. They never properly had the discretion to begin with. So our main point about J is that EPA followed a general practice before J, but it's one thing to have a general practice, and it's another thing to have a codification of how offsets are to be calculated. That has now made its way into federal law. The writing's been on the wall since 2002. The district has had ample time to continue operating under its 1996 rules. They provided ample notice that because they were resubmitting their SIP, EPA now was duty-bound to follow J, and that notice and comment proceeding led us to this Court. And so this is not a surprise to the district in any way, shape, or form. Can I ask you, we're talking about the change as though it was somewhat recent, but in fact it was 22 years ago. What accounts for the time lag here, because you might imagine that if a regulation is put out in 2002 with a certain purpose, that this might have been litigated long before now. That's true. The district had full and fair opportunity as an interested party of the 2002 regulatory reform to challenge that. It didn't. Fast forward in time, EPA had the discretion to go to the district and say, you should update your SIP in light of this 2002 change. EPA did not do that, and there's no requirement that it do that. But what EPA is required to do is assess the district's state implementation plan submittal that came along after a 2018 rulemaking. That's not at issue here. And so EPA now is duty-bound to follow the clear terms of federal law in reviewing the adequacy, the legal adequacy of the district's proposed rules. You know, does the record reflect why, until EPA was forced to pass on a new submission, why it didn't go to the district and, or did it go to the district and say, listen, you now have this 2002 regulation, you better be aware of this, and prior to 2018 or 2019, when all of this starts to now come before the agency? I'm not aware of that history before 2018 and 19. Those are those meetings, the kickoff meetings, if you were, as to this implementation rule for the, I believe it's the 2015 ozone standards. That's what led to these discussions, and EPA is flagging for the district, this offset calculation method is going to be an issue. Let's talk about that. Let's try to get that rectified. Ultimately, they couldn't, we're not able to work out that dispute. The district flagged in its comments, they're very bare bones, we do have that forfeiture issue, I won't get into the details, but the district is flagging, hey, this is an issue that just may have to be litigated. Now, all of these arguments you heard today, it's very clear, you won't find them in whether the district is preventing the EPA. That's part of our background for this forfeiture argument we have here. You know, they knew this was coming. They knew it well before even the notice and comment period began, and so it's incumbent upon them to lay out their cards, like where are they coming from on why they believe federal law requires, as you heard here today, they believe federal law requires this alternative approach that they've adopted. We just disagree with that, but that was never pitched in the fashion that appears in their briefs. So the EPA's explanation here, we think, is fully adequate, but it also is not as soup to nuts as it might have been if EPA received something, not perfectly approaching, but something approaching the level of detail that's in the district's brief and the arguments presented here today. You, earlier in the discussion, you mentioned something to the effect that the district has a grace period under the current rule. What are the details of that? Yes, so this is the SIPP, I keep saying SIPP, State Implementation Plan, a review process, a review and approval process by the EPA. There is provision K3, I call it Clean Air Act Section 110. It translates to a USC code that I don't have at my fingertips, but it is in our addendum, and that is what's called a limited approval, limited disapproval process, where the agency puts the district on notice in a rulemaking that we're disapproving, we're approving many of the rules, but we're doing a limited disapproval of this rule, and you have substantial time to revise it to comply with federal law, but in the meantime, it continues to operate as federal law, that you can rely on it for federal law until such time as it's required to be either replaced by a federal implementation plan if the district declines to change its rules or beyond that deadline if sanctions go against the state, and we have a citation of that in our background. But just so, it sounds like they're allowed to operate under their existing scheme subject to you, the EPA, saying you may not do that? We've already said you may not do that, and the time that the federal implementation plan will come along is late November of this year. And Counselor, is there any other district similarly situated to Mojave that this J affected in the same way that it did Mojave? Yes, the Bay Area Air Quality District tried to do an alternative to J, and it's laid out in our brief, and in EPA's decision here, they said, no, no, you can't do that, J requires that you have an actual emissions-based offset program, so that was disapproved. At the time of the federal, the final decision from the EPA here, EPA had proposed to take a similar action against another air district, and that has been, at first there was a petition for review, but that's now been administratively closed at the direction of the parties in the circuit mediator. But you will not find another air district in the country, we're not aware of one at least, where they're following something different than J under an approved program. I'm not even aware of an older program pre-Subsection J that's still out there. I could be wrong about that, but we looked and we couldn't find one. But if that program then comes to the EPA and tries to have an offset calculation method, the difference from J, EPA, as it was here, will be duty-bound to apply the clear terms of that offset calculation method in ruling on that implementation plan submission. Let me see if my colleagues have any more questions for you. Okay, Mr. Doyle, I want to thank you for your presentation this morning. Thank you. We request that the petition be denied. Thank you, Your Honor. Just a few short points on reply. The first, I would say, is conceptually you are correct. The parties are talking past each other. And we have made this as clear as we can. There are, so I'll back up and hopefully this will help understand what's happening here. There are three steps involved in the permit program. First is whether we need a permit. That's a separate calculation of whether or not there's enough emission increases from this modification that's going to require a permit. The second calculation is, okay, we do need a permit. How many emissions are being caused by this modification? That's the calculation of emission increases. And then the third step is, okay, what emission reductions can we use to offset those emission increases? Now, those are the three steps. And that's important to keep in mind here. The step at issue in J that is being addressed here is the second step. And I've got it right here in front of me. The total tonnage of increased emissions in tons per year resulting from a modification that must be offset in accordance, yada, yada, yada, shall be determined by summing the difference between the allowable emissions and yada, yada, yada. So the point is here, it's entirely addressed to how you calculate the emissions. And we've surrendered on that issue. We have now, while that was a problem, there was an issue in the 1304 C2D emission reductions, according to EPA, getting into that calculation. The district has agreed to revise its rules to ensure that they comply with exactly what EPA wants on both the first step and the second step. So all we're left with now is the third step. And so the continued discussions of subsection J is pointless here. In fact, in the comments, as my friend noted, the district explained that they never intended for the C2D emission reductions to be used in either of those two calculations. And that they only intended them to be a reduction of the amount of offsets required. Which is another way of saying offsetting the emission increases. Which is all that we're talking about here, is offsetting of emission reductions. I understand EPA to be saying some of the effect of what J is telling us is how to do step two, and step three, therefore, needs to follow the same methodology. Yes, you are. So what their argument in that respect was is that the baseline for the calculation needs to be actual emissions. And so we've revised the rules to have actual emissions be the pure baseline on a calculation of the tonnage of increased emissions. The calculation of the baseline, the baseline for the emission reductions at issue here is actual emissions. And you can see that in the boiler example. So there, when we had the emission reductions that are being used to offset, are those that were offsetting the original allowable emissions for the permit, the 100 tons. Now those are calculated using actual emissions as the baseline. That's the rule in the district. The only difference is that when we eliminate the allowable, surplus allowable emissions, now those emission reductions that are real and that were calculated using actual emissions as a baseline are now not otherwise required. It's a totally separate question, which means that they are now available for use to offset other emission increases under subsection C2. So in that regard, there is no distinction here between the parties. There's no dispute, I should say, on this issue of common currency, regardless of whether or not we all agree as to whether or not there's a basis for asserting there needs to be a common currency. Again, we're not in a disputed position. We all agree that these emission reductions would meet that requirement. And that brings me back to the other point here of my friend brought up paragraph A3i. And when you look at the final rule, the EPA expressly states that this is, A3i addresses the definition of net emission increase, which is when you calculate whether or not you need a permit, the rules allow you to net out some emission reductions. But that entire calculation is for whether or not the permit program applies. In fact, it goes to a concept that is not even allowed in the district. The California law does not allow netting for the determination of whether or not a permit applies. So it's completely irrelevant here. And we've made that clear. And to the extent there was any concerns about that in the rules, the district has revised those rules with EPA's assistance. And those revised rules now sit before EPA for approval. EPA says your clients are the only district doing this. Is that true? Whether or not other districts are, I don't know. You know, there's obviously a lot. Is there something unique about your district that's causing it to ask for, to have a different set of programs or rules? No, Your Honor. In fact, it's so common that when you read the 2002 rule, you'll find that EPA actually talks about it being a common way to actually, that the reduction in surplus allowable emissions essentially frees up emission reductions that then can be used to offset other emission increases. And we cited that in our brief. And so the surprise, if there would be, it was actually that EPA is now taking the complete opposite position. In 2002, it recognized that this is a, that these are valid emission reductions and actually says that that can be used throughout the programs. Now, I guess the last point I'll just quickly look at here is when we're talking about the incentivized behavior, the goal that he was talking about was whether or not we would incentivize lower allowable emissions. But the reality is, and I think Judge Van Dyke, you recognize this, when we give greater flexibility in the use of the allowable emissions, what we're doing is encouraging voluntary emission reductions. And EPA recognized that in 2002 when it was addressing the plant-wide applicability limit program. And it recognized the opposite, that a use-it-or-lose-it approach to allowable emissions encourages only operators to maximize emissions, which leads to poorer air quality and the retention of aging, dirtier equipment. So with that, I would just ask one thing here. And if I could, I know we're getting close to the time here, is if the district, I'm sorry, if the court would take swift action here given that the rejection of the offset rule is arbitrary and capricious and not in accordance with the law, and it poses a serious problem for the district because there's going to be an imminent imposition of a federal implementation plan that will usurp the state's authority here in what amounts to a federal takeover, the comment period on that FIP ends in three days. So we would ask this court to either vacate or stay that unlawful rejection of the offset rule before that occurs and substantial harm results. What do you, just to be clear, what is happening in three days that would cause imminent harm? Sorry, I tried to speed read that one. So the federal implementation plan is where the federal government steps in and takes over and replaces the state implementation plan. That has been proposed. It's already been published in a proposed notice of rulemaking. The comment period on that proposed notice of rulemaking ends in three days, after which EPA will be in a position where it could implement that FIP at any time. I thought you said something about November in your... I'm confused. I did not. What's required of you in three days that would cause imminent harm. You asked for a stay, and I thought that that had a November date. So what the November date refers to, Your Honor, is a consent decree that they must do it by. So they have to have this done according to a consent decree with a district court by November, I think it's 24th from the top of my head here. But nothing would stop them from doing it earlier once they've completed the obligation to provide the notice of proposed rulemaking, which they've done. They provide the notice of proposed rulemaking, and that comment period on the proposed FIP expires in three days, at which point they would obviously have to respond to those comments in the final rule. But that final rule can come out at any time after these three days. And so while they have a November deadline, we're facing the imminent imposition of a FIP here. Okay. I think we've let you go over your time. Thank you. Bill, do you have another question? Well, I mean, actually, the question would be for the government. Now that we know about this, I wonder... I'm going to ask Mr. Doyle to come up for a bonus round here. Why don't you just... We'll just take the clock off. Why don't you just respond specifically to this timing issue? Sure. The timing issue. My friend on the other side is correct. There's a notice and comment process going on right now about that federal implementation plan that EPA hopes it doesn't need to do it, but if it has to do it, it was imprudent to start that process. And I don't have the comment period in front of me, but I take counsel at his word that it's got a few more days left on the comment period, and EPA will take substantial time to go through the comments, write up a final rule, and issue that. EPA is not known for meeting deadlines before it has to do them. It may not wait until exactly the deadline in the consent decree, but I'm not aware of any plans to expedite it either. And of course, our global position on the motion to stay is that it doesn't meet the stay factors and should be denied as well. Okay. Okay. Thank you very much. We thank all counsel in this complicated matter. This matter is submitted. We'll stand in recess until tomorrow morning.
judges: BRESS, VANDYKE, Lasnik